UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In Re:                                                    Bankruptcy No. 20-30357
                                                          Chapter 7
Debra Jean Marchus,

                        Debtor.

_____/

Debra Jean Marchus,

                        Plaintiff,

          vs.                                             Adversary No. 20-07017

Student Loans of North Dakota,

                        Defendant.

_____/

**MEMORANDUM AND ORDER**

On July 7, 2020, Plaintiff/Debtor Debra Jean Marchus filed this adversary

proceeding seeking a determination that her student loan debt owed to Defendant

Student Loans of North Dakota (SLND) is dischargeable under 11 U.S.C. § 523(a)(8).

SLND filed an answer on July 30, 2020, denying that Debtor is entitled to the relief she

requested.

The Court tried this case on March 3, 2021.  This adversary action is a core

proceeding under 28 U.S.C. § 157(b)(2)(I).  The Court has jurisdiction under 28 U.S.C.

§§ 157 and 1334, and it has authority to enter a final order in this matter.  This opinion

constitutes findings of fact and conclusions of law in accordance with Federal Rule of

Bankruptcy Procedure 7052.

I.    **Findings of Fact**

   A.    **Background and Education**

Debtor will be 64 years old in June.  She began her long educational journey in the fall of 1975 at North Dakota State University, where she attended classes for one semester.  In January 1976, she began attending Interstate Business College (IBC). Debtor earned a general clerical "degree" from IBC in approximately 1977.  After marrying and having two children, Debtor returned to IBC and earned a general business "degree" in 1980 or 1981.

Debtor divorced in 1986 and moved to Thief River Falls, Minnesota, to "restart my life."  She enrolled at a community college in Thief River Falls to study nursing but stopped taking classes due to family "mishaps."  At some point, she remarried but divorced a second time in 1997.

In September 2007, Debtor borrowed $14,535 from the Bank of North Dakota (BND) to pay educational expenses at Aakers Business College.[1]  Doc. 22; SLND-201. SLND is the guarantor and current holder of the loan.[2]  On her loan application, Debtor indicated that she did not believe she would meet the credit requirements and agreed to submit a credit application from a cosigner.  SLND-201.  Debtor's daughter cosigned for the loan.  Debtor testified that she understood the loan process and her liability, but she

---

[1] The Bank of North Dakota (BND) statements sent to Debtor indicate it made three loans to Debtor.  In addition to the $14,535 loan (Loan #DL 0002) at issue, the statements also list loans in the original sums of $2,645 (Loan #DL 0001) and $2,127 (Loan #DL 0003).  SLND-216.  Neither party offered any additional evidence about these two loans.

[2] The State of North Dakota owns and operates both BND and Student Loans of North Dakota.

did not realize that her daughter cosigned for the loan.  Rather, she thought that her daughter merely provided a reference verifying that Debtor would be able to make the student loan payments.

Debtor testified that she enrolled at Aakers to pursue a degree in accounting. Debtor did not earn a degree from Aakers, however, because she "did not get along at all" with the instructor of a required class.  She took the class several times but never completed the course because of their differences, and Debtor "had to stop" her education at Aakers.

Determined to get her college degree, Debtor enrolled in an online program through the University of Phoenix.  Despite setbacks and interruptions, she earned an associate of arts degree in accounting in 2013.[3]  Debtor testified that it took her "four long years" to graduate "with great difficulty because of the computer aspect of it—it had changed so much."

### B.    Employment and Income History

Debtor's work history since 2007, when she incurred her student loan obligation to BND, includes:

- Desk clerk/auditor at a motel; $8.75/hour; April to October 2007
- Hardware associate at Walmart; $9.80/hour; September 2007 to June 2011
- Home health aide at Marshall County Group Homes; $10.05/hour; May 2012 to May 2013
- Office clerk for Experience Works; 2013-2014
- Receptionist/bookkeeper for Northwestern Homes; 2014
- Cashier at Home Depot; 2014-2015
- Receptionist/bookkeeper at Sahr Oil Co.; 2015
- Cashier at Walgreens; 2015-2016
- Menard's; 2017-2018

---

[3] BND did not finance this portion of her education.  Debtor obtained additional student loans for her education from other lenders.

- Cashier and stocker at Dollar Tree; $9.25/hour; May 2018 to Fall 2019; and Spring 2020
- Stocker at Family Fare; $11.00/hour; September 2020 to present

Among these jobs, Debtor obtained full-time employment with only one employer—Marshall County Group Homes. Debtor testified she has tried to find full-time work since 2006, but no one will hire her.

At the time she was pursuing her degree from the University of Phoenix, and after she graduated, Debtor lived in Warren, Minnesota. She intended to use her degree to perform accounting work in a small office, but she found no jobs in her field in Warren, and she could not afford to move. Instead, she worked at part-time jobs at Kmart and Walmart. She did not pursue additional continuing education training because it was not available in Warren.

For three months in 2014, Debtor worked as a bookkeeper and secretary for Northwestern Homes. She testified that she was terminated from that job because she "could not get there on time because I lived 30 miles away and I have a sleeping disorder."[4]

In 2015, Debtor moved to Fargo, North Dakota, to be closer to family. She obtained a job as a receptionist/bookkeeper at Sahr Oil Company. Sahr Oil Company fired her because she arrived to work late (due to her sleep disorder) and because of

---

[4] Debtor described her sleep disorder, which she maintains has afflicted her since high school. She testified that she does not sleep well. When she falls asleep, it is only for a few hours at a time. Once she is asleep, however, she finds it difficult to wake. She testified that she needs four alarms to wake each morning. Debtor sought help for her sleep issues through sleep testing at a local hospital. The hospital recommended equipment to improve her sleep, but she was—and is—unable to afford the equipment. Instead, Debtor takes Tylenol PM to help her sleep. She has not received a note from a doctor limiting her work due to her sleep issues.

4

issues "getting along with the owner."

Debtor created a resume at Job Service in 2016, but she has not updated it.  See D-109.  On this resume, Debtor represented that her qualifications include approximately 15 years of accounting experience.  Id.  Debtor explained, however, that accounting work has changed significantly since her accounting work experience began in 1977.  Her bookkeeping positions with Northwestern Homes (2014) and Sahr Oil (2015) comprise her relatively recent work history related to accounting.

With regard to the technical skills necessary to foster a profession in accounting or other office work, Debtor clarified that she never worked with computers despite her years of experience in office and retail settings.  She readily acknowledged that her technological incompetency limits her job prospects.  In her words, she does not have "computer knowledge" anymore.  Although she took online courses to obtain her associate's degree, she claims she "was having a very hard time."  She intended to learn to use computers through the college program, but the instructors did not teach her how to use technology.  When asked whether she sought other help to improve her computer skills, she answered: "Couldn't afford to.  There was no places available."

Debtor applied for various office jobs over the years, but "they have repeatedly said no," presumably because of her lack of computer skills.  She also believes potential employers hire younger workers.  Debtor has not applied for any jobs in the accounting field in the last two years.

Debtor also testified she is unable to work as a cashier.  She explained, "I don't know how to work the registers. . . I tried once, and they gave up on me. . . I don't remember the steps and when there's, for example at the grocery store the sales are

every week.  I don't remember the sales."

Debtor completed online applications for the last few positions she sought, but she has not applied for a job online in more than a year.  Although she owns a laptop, it has been outdated for at least four years, and she cannot afford to update it.  She maintains it would be less expensive to get a new laptop than to update her current one, but she cannot afford that either.

On her resume, Debtor also lists "25 years of experience with customer service in both office and retail settings" among her qualifications.  While she has previous customer service experience, Debtor testified that her personality and temperament are not suited to it today.  Consistent with her self-description, Debtor demonstrated brusque and irascible characteristics during trial that may not work well in customer service.

Debtor explained that she is not currently searching for jobs because "they won't hire me because of my personal disabilities.  I call them disabilities.  Legally, medically, they say I'm not bad enough, but then why am I in bed all day Sunday?  Why can't I get up?"  Debtor listed some of her medical and physical conditions, including arthritis, water retention, relapses of colitis, chronic sinusitis (resulting in six sinus surgeries), no upper arm strength, weight gain, lack of blood flow in her legs, thyroid disease, hiatal hernia and kidney disease.  D-112.  Debtor explained that she has arthritis in her hip and spine.  She takes Tylenol for the pain.  She cannot grip her hand tightly because of water retention.  A medical provider removed Debtor's thyroid, which "affects other parts of the body and makes them not work."  She testified that she gained 30 pounds in the last three years for no apparent reason other than her body is not working correctly.

Debtor's back "has gone out" several times over the years.[5]

Despite these health issues, physicians have not diagnosed Debtor with a permanent physical disability limiting her ability to work.[6] Periodically, Debtor received notes from doctors limiting her work temporarily, but they never suggested long-term restrictions. Debtor learned to "fix" some of her issues because of the frequency of them, but she asserts that, collectively, she is "a mess" physically.

Debtor maintains her physical health conditions affect her ability to work. Debtor cannot sit for any length of time because of the pressure it puts on her spine. If she does not keep moving, her legs hurt. She also suffers from chronic sinusitis,[7] resulting in constant sniffling. She is embarrassed by her sniffling because people think she is sick. Debtor asserts that these limitations prevent her from working in an office.

Although Debtor was unemployed at the time she petitioned for bankruptcy relief, she is now working part time as a night stocker at a grocery store, earning $11.00 per hour with no insurance benefits. She works limited hours because of her physical

---

[5] The parties stipulated to the admissibility of 516 pages of Debtor's medical records from 2013 to 2019. SLND-215. According to these records, Debtor's medical history also includes diagnoses Debtor did not list or discuss at trial, including depression, anemia, chronic rhinitis, Graves disease and more. See SLND-215 at p. 429 (and throughout).

[6] Debtor filed a Social Security disability application in August 2013, claiming her disability began in June 2013. In April 2018, Debtor applied for supplemental Social Security income. She testified she "has been to disability court" three times seeking to establish her disability with no success. She claims the Social Security Administration denied her applications because it considered her health issues in isolation and not collectively.

[7] Debtor's sinusitis began after sinus surgery related to migraines. That surgery "screwed up" her nasal passages. After a second surgery, she had difficulty breathing. Debtor has undergone six surgeries—all unsuccessful attempts to eliminate her sinus issues.

limitations.  Debtor currently works Thursday, Friday and/or Saturday nights from 11:00

p.m. to 7:00 a.m.  She explained that the overnight shift is manageable with her sleep

issues, and her sniffling is not a problem because she does not interact with the public.

On Sundays, she remains in bed all day because her body hurts so severely from

working the previous days.  Debtor described the interplay between her work ethic and

the pain that working causes her:

> I don't sit at home.  I'm not a stay-at-home type person—doing nothing.  I'm
> not that kind of a person.  So, I have decided, even though it hurts, like,
> everything . . ., that I can do this for this many days or this many hours at a
> time.

* * *

> I'm not a beggar . . .  I'm able to do stuff.  I try my best to do what I can—by
> myself, for myself.  And I suffer because of it.

In her trial brief, Debtor suggests her monthly income totals $450.  Based on

Debtor's pay advices from September 2020 to November 2020, she earns

approximately $581.88 per month in net income from her part-time job.[8]  Her monthly

income also includes $772 or $840 in Social Security benefits[9] and $204 per month in

Supplemental Nutrition Assistance Program (SNAP) benefits.  <u>See</u> D-101; D-106.  Her

only source of medical coverage is through Medicaid.  If her pay advices accurately

reflect her current wages, Debtor's net monthly income totals, at most, $1,625.88.

---

[8] To determine her average monthly income, the Court added the net income
from seven pay advices dated September 20, 2020 to November 7, 2020 [D-111],
divided that sum by seven for her average weekly income ($145.47) and multiplied that
sum by four for her average monthly net income.  Debtor did not testify about her
income other than she earns $11.00 per hour.

[9] On Schedule I, Debtor disclosed monthly income of $772 from Social Security
benefits, but at trial, Debtor testified that she received $840 per month from Social
Security.  <u>See</u> D-101.

8

Similarly, Debtor's federal income tax returns reflect very modest adjusted gross income:

| | |
|------|--------|
| 2006 | $18,433 |
| 2007 | 9,189 |
| 2008 | 16,792 |
| 2009 | 16,082 |
| 2010 | 18,419 |
| 2011 | 17,537 |
| 2012 | 20,351 |
| 2013 | 9,060 |
| 2014 | 9,749 |
| 2015 | 20,560 |
| 2016 | 12,088 |
| 2017 | 14,149 |
| 2018 | 9,203 |
| 2019 | 11,290 |

D-110.  In short, Debtor's adjusted gross income the past 15 years averaged $14,493 per year.

Debtor received federal and state tax refunds totaling $470 last year.  D-101 at 4. Debtor has not yet filed her 2020 tax return, but she anticipates a similar refund this year.

Debtor does not anticipate any change in her employment.  Although her employer offered her an additional night of work per week, she testified "I don't think I can handle it."  Further, Debtor believes that the additional income would render her ineligible for the SNAP benefits and medical assistance she is currently receiving.  She testified that the additional income "would not make up for" the cost of these lost benefits.  She is also concerned that she might currently be earning too much to continue to qualify for her social security early retirement benefits.  If she loses that income, she will not have enough money to sustain her modest lifestyle.  She has not applied for other jobs since she began her current position.

9

C.    **Assets**

Debtor does not own any real property.  Collectively, the value of Debtor's assets on the date of her bankruptcy petition totaled $4,781.  D-101 at 5.  These assets (and their values) include:

- 2005 Jeep Liberty ($3,341)
- Household goods and furnishings ($500)
- Clothing ($100)
- Jewelry ($25)
- Checking account ($20)
- Savings account ($25)
- Security deposit for apartment ($300)
- Federal ($458) and state ($12) tax refunds

Id. at 1-5.

Since filing her bankruptcy petition, Debtor purchased a different vehicle because the 2005 Jeep Liberty she owned required frequent repairs.  The last time it "broke down," Debtor could not afford the $500 repair.  Consequently, she surrendered it to the secured lender.

Debtor purchased a 2004 Chrysler PT with 151,000 miles in January 2021.  D-113.  Using the stimulus funds she received from the federal government, Debtor made a $600 down payment on the purchase.  After adding taxes and fees and subtracting the down payment, Debtor financed $4,548.28 at 16.9% interest.  Id.  Debtor testified that she needs a vehicle to travel to work, which is more than a mile from her residence.

Debtor has not obtained any other property since she filed her bankruptcy petition.

D.    **Liabilities and Expenses**

On Schedule J, Debtor listed monthly expenses totaling $1,151.  D-101.  At trial, she offered evidence showing that her actual current expenses are slightly higher, as

detailed below.

|  | Schedule J | Other Trial Evidence |
|---|---|---|
| Rent | $485 | $495 (rent increased; housing assistance pays $30/month) |
| Electricity, heat, gas | $40 | |
| Food & housekeeping | $150 | $354 (her scheduled expense did not include $204 in SNAP benefits she spends on food) |
| Clothing & laundry | $50 | |
| Transportation | $100 | |
| Vehicle Insurance | $76 | $70 (new vehicle) |
| Car payment | $250 | $206 (new vehicle) |
| **Total** | **$1,151** | **$164 (total increase in monthly expenses)** |

Debtor's current monthly expenses total $1,315.

Debtor lives alone in a one-bedroom apartment. Her rent is $525 per month, but she recently began receiving $30 per month in housing assistance. Debtor's daughter pays for Debtor's cell phone. She cannot afford cable television and budgets zero for entertainment. She watches movies she owns for entertainment. Before she moved to Fargo, she bought used furniture from secondhand stores and refinished it, but her limited income forced her to forgo this hobby. Debtor buys her clothing at secondhand stores. She has not purchased "anything" for full price "in a great number of years," and the last time she bought "anything" new (unused) was many years ago. She supplements her meager food and housekeeping budget with donations from the local food pantry. Debtor eats at McDonald's "once in a blue moon."

11

**E.      Educational Loans**

BND scheduled Debtor's loan repayment to begin on March 1, 2009.  At Debtor's request, BND granted numerous loan forbearances and deferments over the next 9 years.  Debtor explained that, after she stopped taking college classes, she "had several surgeries" and could not work full time.  She also testified:

> I was divorced and I was still raising my children to graduate from high school and for them to go on.  I was having a very hard time just sustaining a household.  I could not afford to make any payments.  That's why I was requesting forbearances and deferments.

Periodically, a forbearance or deferment period ended without Debtor seeking an extension.  On those occasions, BND billed Debtor for a few months, Debtor applied for another forbearance or deferment, and BND granted it.  Between March 2009 and September 2017, BND granted 22 months of forbearance and 68 months of deferment.  Bob Baier, a collections and recovery manager at BND, testified that deferments are available for many reasons at BND's discretion, including economic hardship and unemployment.  In Debtor's case, BND based the deferments on inability to pay.

On December 21, 2015, Debtor paid $8,953.21 toward her BND debt from an inheritance she received from her parents.  SLND-216 at 82.  Based on the statements BND sent Debtor, it appears BND applied this payment to satisfy Loan #DL 0001 and Loan #DL 0003 (see supra note 1), leaving a remaining balance on Loan #DL 0002 totaling $25,743.85.  SLND-216 at 80, 84.

Debtor made a $250 payment to BND on March 31, 2016, and a $200 payment to BND on May 27, 2016.  SLND-216 at 94, 99.  These are the only installments Debtor paid toward the particular loan at issue (#DL 0002).

In August 2017, Debtor entered a contract with The Debt Liberators.  D-107.  She

12

explained that a former counselor from the University of Phoenix started The Debt Liberators and contacted her about participating in its program.  Debtor agreed to enroll. She understood that The Debt Liberators sent BND a proposal, suggesting Debtor pay her debt with much lower payments than those BND demanded at the time.  She testified that she was "trying to pay what she owed."  According to Debtor, if SLND would have agreed to accept The Debt Liberators' offer to "write off" the accrued interest and accept payment of the principal debt only, she could have and would have paid it.

In a letter dated January 19, 2018, Mitch Auer from BND advised Debtor that BND received a letter and power of attorney authorization from "Liberate Debt."  SLND-216 at 193.  Auer informed Debtor that BND would not honor the request to direct all future correspondence to Liberate Debt because the power of attorney authorization form was not notarized or certified by a notary public; BND was unclear who Debtor was authorizing to act on her behalf, Liberate Debt or Debt Liberators; and Debtor's documentation did not identify whether Liberate Debt or Debt Liberators is an organized business entity such as a corporation or limited liability company.  Id.

Baier testified that the North Dakota Attorney General generated the language used in the letter.  BND receives many letters like the one from Liberate Debt.  Many of these organizations are not licensed in North Dakota, and their services are not in borrowers' best interests.  Baier also explained that many of them are debt settlement businesses, and BND does not settle or reduce indebtedness.

Meanwhile, a deferment period ended in September 2017, and BND began billing Debtor for her current monthly payment ($365.06) and late fees.  SLND-216 at

13

132.  At some point after the deferment ended, Debtor contacted BND to negotiate a monthly payment.  She claims she offered to pay $50 or $100 per month and that the BND representative laughed at her offer.  She attested to lifelong bullying experiences and said that she nearly hung up on the person who laughed at her "because I do not tolerate any such thing."

Christopher Schneider, a recovery specialist at SLND, provided more context. He testified that he reviewed Debtor's file which indicated that the previous director of SLND offered Debtor a $50 per month temporary repayment plan for one year. Presumably, this indication in the file memorialized the conversation with the person who Debtor claims mocked her.  Debtor agreed to the plan but did not make any payments.  SLND intercepted Debtor's tax refund because she missed payments. Debtor called SLND, inquiring about her intercepted tax refund.  Again, she agreed to begin making $50 monthly payments for a one-year period, but she failed to comply with this agreement as well.

From the time the last deferment ended through June 2018, BND sent Debtor bills demanding payment in the following sums:

|  |  |
|---|---|
| September 2017 | $390.06 |
| October 2017 | $755.12 |
| November 2017 | $1,125.18 |
| December 2017 | $1,495.24 |
| January 2018 | $1,865.30 |
| February 2018 | $2,235.36 |
| March 2018 | $2,605.42 |
| April 2018 | $2,975.48 |
| May 2018 | $3,345.54 |
| June 2018 | $3,715.60 |

SLND-216.

In June 2018, BND sent Debtor a notification warning that it would "no longer tolerate the delinquency on your student loan(s)" and demanding payment in full of the entire outstanding balance of principal, interest, late charges and other fees, totaling $30,392.30. Id. at 163. BND also sent several letters to Debtor's daughter, who cosigned for the loan, demanding payment. Id. at 185.

Debtor defaulted on the BND loan in September 2018, and SLND purchased the loan from BND. SLND sent Debtor delinquency statements and served her with a summons and complaint related to the unpaid loan on January 24, 2020. Debtor contacted Schneider after she received the summons and complaint. She insisted that SLND release her daughter from liability, accept payment of $100 per month and drop the lawsuit. Schneider told her, "I can't do that," and referred her to SLND's counsel.

Schneider explained SLND's rehabilitation program available to borrowers who are in default. He testified that, to "get the loan back with BND," the borrower must make nine consecutive payments. BND calculates the required minimum payments by amortizing the total default over 10 years. If the borrower in default makes the required payments, the loan may be "bought back" and the borrower removed from default status. At trial, Schneider did not provide the specific monthly sum Debtor would have to pay to participate in the rehabilitation program. Basic math reveals that Debtor's monthly payment would be at least $320.95 (dividing Debtor's $38,514.50 outstanding debt by 120 months), plus 7.32% interest on the account.

Debtor claims neither BND nor SLND told her about the rehabilitation program. After the forbearances and deferments ceased, she tried to obtain a full-time job. She moved to Fargo to help her family, and she is now financially unable to move from

15

Fargo to another location.  Despite continual rejections from potential employers, she

actively sought better positions to improve her situation.  Debtor also sought financing

from other lenders to pay BND/SLND, but the lenders rejected her applications because

of her limited income.

As of February 24, 2021, the balance of Debtor's debt to SLND totaled

$38,514.50.  Doc. 22.

### F.    Bankruptcy

Debtor filed her petition under Chapter 7 of the Bankruptcy Code on June 18,

2020.  Debtor's only secured debt relates to her vehicle.  Her only unsecured debts

relate to educational loans, including the debt at issue and a larger debt to Great Lakes.

Debtor acknowledged at trial that she petitioned for bankruptcy relief to discharge her

student loan debts because she cannot afford to pay them.

## II.    Conclusions of Law

### A.    Student Loan Dischargeability Standards

Section 523(a)(8) of the Bankruptcy Code provides that debts arising from certain

educational loans or benefits may not be discharged unless "excepting such debt from

discharge . . . would impose an undue hardship on the debtor and the debtor's

dependents."  11 U.S.C. § 523(a)(8).  Unlike many other debts, a debtor's obligation to

pay a student loan debt remains until there is an express determination that the loan is

dischargeable.  Conway v. Nat'l Collegiate Tr. (In re Conway), 495 B.R. 416, 419

(B.A.P. 8th Cir. 2013).  In other words, the exception from discharge under section

523(a)(8) is self-executing; the discharge order will not include a student loan debt

unless a debtor affirmatively secures a hardship determination.  Id.; see also Wells v.

U.S. Dep't of Educ. (In re Wells), 2020 WL 907800, at *3 (Bankr. D. Neb. Feb. 25, 2020).

The debtor bears the burden of establishing undue hardship by a preponderance of the evidence. Kemp v. U.S. Dep't of Educ. (In re Kemp), 588 B.R. 226, 230 (B.A.P. 8th Cir. 2018); Walker v. Sallie Mae Servicing Corp. (In re Walker), 650 F.3d 1227, 1230 (8th Cir. 2011). "The burden is rigorous. 'Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged.'" Educ. Credit Mgmt. Corp. v. Jesperson, 571 F.3d 775, 779 (8th Cir. 2009) (quoting Long v. Educ. Credit Mgmt. Corp. (In re Long), 322 F.3d 549, 554-55 (8th Cir. 2003)). In analyzing the debtor's undue hardship claim, the Court examines the unique facts and circumstances of the particular bankruptcy case. Id.; Swafford v. King (In re Swafford), 604 B.R. 46, 49 (Bankr. N.D. Iowa 2019) (citing In re Long, 322 F.3d at 554). More specifically, in assessing whether a debtor has met his or her burden of proving undue hardship, courts in the Eighth Circuit apply a totality-of-circumstances test, under which they consider: "(1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the reasonable living expenses of the debtor and her dependents; and (3) any other relevant facts and circumstances surrounding the particular bankruptcy case." In re Walker, 650 F.3d at 1230 (citing In re Long, 322 F.3d at 554); In re Kemp, 588 B.R. at 230-31; In re Wells, 2020 WL 907800, at *4.

In analyzing the facts under the totality of the circumstances test, a bankruptcy court makes the "post-discharge undue hardship determination . . . on the basis of the facts existing at the time of trial." Conway v. Nat'l Collegiate Tr. (In re Conway), 542

17

B.R. 855, 858 (B.A.P. 8th Cir. 2015) (citing Walker v. Sallie Mae Servicing Corp. (In re Walker), 427 B.R. 471, 482–84 (8th Cir. BAP 2010)). "The bankruptcy court must make a decision based on the most reliable evidence before it." Id.

**B.    Analysis**

### 1.    Debtor's past, present and reasonably reliable future financial resources

In applying the first prong of the totality of the circumstances test, the Court considers a debtor's past, present, and reasonably reliable future financial resources. In re Walker, 650 F.3d at 1230. "A court may not engage in speculation when determining net income[.]" In re Jesperson, 571 F.3d at 780 (citing Rose v. Educ. Credit Mgmt. Corp. (In re Rose), 324 B.R. 709, 712 (B.A.P. 8th Cir. 2005)). The Court is "obligated to consider not just a snapshot of her current situation but her likely future income based upon her education and employment history." Brown v. Am. Educ. Servs., Inc. (In re Brown), 378 B.R. 623, 627 (Bankr. W.D. Mo. 2007). "A debtor's attempts to obtain employment is one factor for the court to consider in determining earning capacity." Brooks v. Educ. Credit Mgmt. Corp. (In re Brooks), 406 B.R. 382, 383 (Bankr. D. Minn. 2009).

Debtor's tax returns show that her annual adjusted gross income for the past 15 years averaged $14,493. She earned her highest annual salary in 2015—$20,560. She worked for numerous employers performing a variety of tasks but earned only meager wages.

Her present financial resources are likewise modest. Debtor owns virtually no assets. Debtor earns approximately $581.88 per month in net income from her part-time job. Her monthly income also includes between $772 and $840 in Social Security

benefits and $204 in SNAP benefits.  D-106.  With these government benefits, her net monthly income ranges between $1,557.88 to 1,625.88.

Debtor's reasonably reliable future finances are not promising.  Debtor is almost 64 years old.  She holds no pension or investment accounts and saved no money for retirement.  Her employment and income opportunities are limited, and the prospect of Debtor increasing her income either through new employment or a promotion at her current job appears bleak.  Based on her education, work experience, health issues and temperament, the Court finds it unlikely she will earn more than her present income.  If she earns more wages, she may lose SNAP and medical benefits.  Additionally, Debtor's voluminous medical records and her testimony regarding on-going health concerns suggest that these issues are unlikely to resolve and may increase in severity in the future.  Accordingly, Debtor's past, present and reasonably reliable future financial resources are modest.

### 2.    Reasonable and necessary living expenses

In analyzing the second prong of the totality-of-circumstances test, the Court considers Debtor's reasonable and necessary living expenses to determine whether she can afford payments on her student loans and maintain a minimal standard of living. See In re Walker, 650 F.3d at 1234.  "A debtor is entitled to 'sufficient financial resources to satisfy needs for food, shelter, clothing and medical treatment' to maintain a minimal standard of living."  Piccinino v. U.S. Dep't of Educ. (In re Piccinino), 577 B.R. 560, 565 (B.A.P. 8th Cir. 2017) (quoting Nielsen v. ACS, Inc. (In re Nielsen), 473 B.R. 755, 760 (B.A.P. 8th Cir. 2012)); see also Clavell v. U.S. Dep't of Educ. (In re Clavell), 611 B.R. 504, 517 (Bankr. S.D.N.Y. 2020) (applying the stricter Brunner test, "minimal

standard of living" does not require that the debtor live in poverty).  For an expense to

be reasonable and necessary, it must be "modest and commensurate with the debtor's

resources."  In re Conway, 495 B.R. at 422 (quoting Jesperson, 571 F.3d at 780).  "[A]

court may not engage in speculation when determining net income and reasonable and

necessary living expenses."  Jesperson, 571 F.3d at 780.

The evidence reflects that Debtor's standard of living is minimal at best.  All of

her expenses are necessary, but exceptionally low—arguably unreasonably low.  She

lives in a one-bedroom apartment and drives a 17-year-old vehicle.  Her food budget is

supplemented by governmental benefits and charity.  She spends nothing on

entertainment and instead watches movies she owns.  She does not subscribe to cable

television, and her daughter pays for her telephone.  She buys her clothing at

secondhand stores.  She stopped buying used furniture from secondhand stores and

refinishing it because her limited resources no longer allow her to indulge in this hobby.

She eats at McDonald's "once in a blue moon."

On Schedule J, filed June 18, 2020, Debtor listed a monthly net disposable

income of negative $179.  This negative number is understated by $204 because

Debtor included SNAP benefits in her income while neglecting to acknowledge that she

spent these benefits in addition to the $150 she budgeted for food, resulting in a

negative disposable income totaling $383.  Since filing her bankruptcy schedules, her

monthly expenses decreased by $40 and her monthly income increased by an

estimated $581.88, depending on the number of hours she works.  If Debtor incurs no

further rent increase, unexpected vehicle or medical expenses, if her health does not

interfere with her ability to work part-time, and if she continues to spend no money on

entertainment and a cell phone, it is possible that Debtor may realize monthly net disposable income between $242.88 to $310.88. Debtor currently maintains her spartan standard of living without making student loan payments, but a student loan payment in the sum of her monthly obligation before bankruptcy ($365.06 plus interest and late fees) or the sum necessary under SLND's rehabilitation program ($320.95 plus interest) would render her unable to sustain a minimal standard of living.

### 3.    Other relevant facts and circumstances

The third prong of the totality-of-the-circumstances test requires the Court to consider all other relevant facts or circumstances surrounding the bankruptcy case. Bankruptcy courts in the Eighth Circuit have considered a number of factors in analyzing the third prong of the totality-of-circumstances inquiry, including:

> (1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of the study; (7) whether the debtor has made a good faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness.

In re Piccinino, 577 B.R. at 566. "These numerous factors do not provide an exclusive list of items that courts may consider and also do not require a court to address each and every one in a particular case." Id. "These are mere factors for a court to consider, and a court need not address each and every one of them, particularly where there is no evidence, one way or the other, concerning a factor." Hurst v. S. Ark. Univ. (In re Hurst), 553 B.R. 133, 138 (B.A.P. 8th Cir. 2016). "The purpose of this final inquiry allows a court to consider any other relevant information that would be persuasive to

21

overcome the income and expense analysis of undue hardship under the first two factors of the totality of the circumstances test." Fern v. FedLoan Servicing (In re Fern), 563 B.R. 1, 4-5 (B.A.P. 8th Cir. 2017).

SLND's arguments fall under the third prong.  It argues that Debtor "has not made a good faith effort to maximize her income due to her self-imposed work restrictions, her lack of effort in obtaining better employment, and failing to keep updated with her professional requirements." Doc. 35 at 7.  It claims, "These circumstances are entirely within her control." Id.  It further asserts that Debtor provided no expert testimony or medical evidence to substantiate her claim that her physical issues limit her ability to work. Id.  The Court disagrees with SLND's characterizations.

Debtor offered compelling and credible testimony about her physical conditions and the resulting limitations.  Debtor's physical conditions include arthritis, water retention, relapses of colitis, chronic sinusitis (resulting in multiple sinus surgeries), no upper arm strength, weight gain, lack of blood flow in her legs, thyroid disease, hiatal hernia and kidney disease.  Debtor has suffered from these various conditions for many years, and there is no evidence to suggest they will improve.  Debtor will be 64 years old in June, and the medical records, coupled with Debtor's testimony, suggest that her physical conditions will persist indefinitely.  There is no evidence that Debtor's physical limitations are exaggerated or that the work restrictions (either suggested by physicians or self-imposed) are unreasonable.  To the contrary, 516 pages of Debtor's medical history include a myriad of diagnoses and substantiate her long history of medical and physical conditions and limitations.

22

The Court also disagrees with SLND's suggestion that Debtor has not attempted to improve her financial situation, obtain better employment and maximize her income. Debtor's long educational history demonstrates her determination to earn her degree and increase her income. Her educational pursuits did not ultimately yield a lucrative career, but her prolonged efforts to achieve a degree in a marketable field show her interest in improving her financial situation.

Debtor earned an associate's degree, which is not an advanced degree. She testified that she was unable to obtain a job in her field where she lived when she graduated, and she could not afford to move. She has no recent work experience in her field due to her inability to find such work. She credibly testified that she possesses very limited technological competency, an integral skill for office work. She also described and demonstrated personality traits that make her less suitable for traditional office or retail work. Given her physical limitations, limited experience and personal traits and circumstances, her options were and are limited. This is not a situation where a highly skilled debtor with an advanced degree declines to seek employment commensurate with her education, qualifications and experience. Debtor credibility testified about her difficulty obtaining and keeping jobs over the years. She accepted the employment she could find. In her closing argument, she provides a compelling response to SLND's suggestion that she is underemployed:

> It makes no sense that Plaintiff/Debtor would traipse through an exhaustive list of jobs just to avoid paying the Defendant. The more plausible explanation is that she simply cannot do more, whether because of age, skill set, or disability. It also doesn't make sense that Plaintiff/Debtor's mission was to secure higher education at the expense of Defendant, with no intention of paying back the loan, so she could live in a one bedroom apartment, driving to work in a high mileage vehicle where she spends her nights stocking shelves at a grocery store and, at the end

of the day, having no disposable income after covering for the most modest
of expenses.

Doc. 37 at 2.  The Court agrees and finds that Debtor has made good faith efforts to
maximize her potential and that her inability to pay her debts is the consequence of
circumstances unrelated to her work ethic or her desire to improve her financial status
and pay her debts.

Additionally, SLND asserts that the large ratio of Debtor's student loan debts to
her overall indebtedness—and Debtor's admission that the purpose of her bankruptcy
filing was to discharge her student loans—weighs against discharge of the debt to
SLND.  The Court views these facts differently.  It views the overwhelming ratio of
Debtor's student loans to her overall indebtedness as indicative of her remarkable
frugality in not incurring more debt in the face of scant income.  It further demonstrates
the extent of the hardship on Debtor to service the debt to SLND.  The extent of the
hardship explains her decision to file for bankruptcy relief after SLND initiated a
collection action against her.  Given her incredibly modest standard of living, Debtor
could not—and cannot—afford to make the payments SLND requires without imposing
an undue hardship.

Finally, SLND emphasizes that Debtor has made only two payments toward the
loan totaling $450.  Although SLND did not acknowledge the large payment Debtor
made to BND in December 2015 after she received her inheritance,[10] the evidence
shows it granted many of her forbearance, deferment and low payment requests.
Debtor's payment history weighs against discharging her student loan debt, but the

_____

[10] This payment is reflected in the statements BND sent to Debtor.  See SLND-
216 at 82.

24

other facts and circumstances described above weigh in favor of granting this relief.

In summary, at the time of trial and for the foreseeable future, Debtor does not earn sufficient disposable income to pay her student loan debt to SLND.  It imposes an undue hardship on her.

**III.     Conclusion**

The Court considered all other arguments and deems them to be without merit or unnecessary to discuss. For the reasons stated above, the Court finds that Debtor's debt to SLND imposes an undue hardship on her.  Accordingly, Debtor's debt to SLND is discharged under 11 U.S.C. § 523(a)(8).

Dated this 18th day of May, 2021.

SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT